IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 14, 2009 Session

## JOHN JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 00-05917, 00-05918     W. Mark Ward, Judge**

_____

**No. W2007-02847-CCA-R3-PC  - Filed September 14, 2009**

_____

The petitioner, John Johnson, appeals the denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel.  Following our review, we conclude that the petitioner has not met his burden of demonstrating either that counsel was deficient or that any of the alleged deficiencies in representation prejudiced the outcome of his case.  Accordingly, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism (on appeal) and Byron B. Winsett, III (at hearing), Memphis, Tennessee, for the appellant, John Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of especially aggravated robbery and theft of property over $10,000 and sentenced to twenty-five years and ten years, respectively, to be served consecutively. His convictions and sentences were affirmed on direct appeal, and our supreme court denied his application for permission to appeal.  See State v. John Johnson, No. W2002-01333-CCA-R3-CD, 2003 WL 22794530 (Tenn. Crim. App. Nov. 18, 2003), perm. to appeal denied (Tenn. May 10, 2004).

The underlying facts of the case as presented by this court on direct appeal are as follows:

Edgar Hawkins testified he owned a courier service which picked up cash deposits at businesses and delivered them to banks. He recounted he had just picked up over $57,000 from the hardware store, placed the deposit in his green shoulder tote bag, and exited the store when he noticed a teal Ford pickup truck parked behind his van. According to Hawkins, the [petitioner] approached him and said, "Drop it off, dog." Hawkins stated the [petitioner] then put a semi-automatic pistol to his head and said, "Give me the bag." He said he gave the [petitioner] the bag, and the [petitioner] shot him in the leg. He testified he and the [petitioner] then struggled over the gun for an extended time "all over that parking lot." Hawkins stated he finally wrested the gun away from the [petitioner] just before the police arrived. The police cuffed both the [petitioner] and Hawkins, not knowing at that point which one was the perpetrator.

Kimberly Stevens, the hardware store employee, testified Hawkins picked up the bank deposits and exited the store. She said she saw the [petitioner], who was wearing a black ski mask and holding a gun, get out of the teal truck and point the gun at Hawkins. She testified Hawkins and the [petitioner] struggled over the bag and the gun. She heard a gunshot when the [petitioner] and Hawkins moved behind her truck, which was in the parking lot. She said that when the [petitioner] and Hawkins returned from behind the truck, they no longer had the bag and were still struggling over the gun. According to Stevens, Hawkins' green bag was later found behind her truck. She indicated the men continued to struggle over the gun until the police arrived.

Andre Farmer testified that his teal green Ford Ranger pickup truck was stolen the week before the robbery. Farmer stated his truck was stolen at a gas station, although the [petitioner] was not the person who actually stole the truck. Farmer identified his truck as the one the [petitioner] drove to the hardware store.

Id. at *1.

At the evidentiary hearing, the petitioner testified that his doctor told him that he is easily misled by others, "ha[s] a lower score IQ that a person can score which falls up under the mental retarded range," and has trouble understanding legal issues. However, he acknowledged that he understood English and the conversations he had with his trial counsel. According to the petitioner, a man named Shaka Jones, driving a gold 2000 Tahoe, picked him up at a friend's house and asked if he wanted to make some money. They drove around for approximately an hour and then pulled into an apartment complex. Another man pulled in behind them, and Jones got out of his vehicle and talked to the other man. Jones and the petitioner got into a truck that was sitting in the parking lot and drove to the hardware store, followed by the other man who was driving Jones' Tahoe. Jones put a pistol in the petitioner's pocket and told him that "all [he] had to do was show [the victim] the

2

gun and he was going to give [him] the money." The petitioner said that he informed his trial counsel and the detective of this sequence of events.

The petitioner admitted his involvement but asserted that he was not the one who stole the truck and that he never got the money bag from the victim. He stated that the gun discharged and struck the victim in the leg when he and the victim were "tussling" over his gun. He said that at the time of the incident, he "had been up about two or three nights . . . smoking marijuana and drinking, drink a little alcohol, a little syrup, [and] popped a couple of pills[.]" The petitioner stated that he had a conflict with one of the jurors in the past and believed that the juror did not like him. In addition, the juror told one of the petitioner's girlfriends that he and another juror were planning to find the petitioner not guilty, "but somebody told them that majority rules." The petitioner acknowledged that he did not tell trial counsel during the trial that he knew the juror because he was not "sure who he was" until afterward. However, after the trial, he asked counsel to investigate the jury's verdict.

The petitioner's second trial counsel testified that he represented the petitioner for approximately thirty days before the petitioner's case went to trial. Counsel discussed the State's offer with the petitioner and argued the motions that were filed by the petitioner's first counsel. Counsel recalled that the petitioner told him that "there were some people who had set him up to be involved in a scam that involved a phony robbery." Asked if he had an opportunity or reason to review the petitioner's mental health abilities, counsel stated, "I knew there had been a mental health evaluation that came back positive, but I don't remember anything other than that. And I don't remember my being alarmed in any way that I thought maybe he was not competent to make the decisions he needed to make." He elaborated that he did not recall anything that caused him alarm about the petitioner's mental health or he would have asked for another evaluation.

The petitioner's third trial counsel testified that he took over representation of the petitioner from attorneys at the public defender's office around the time the case was getting ready to go to trial. When counsel was appointed, several motions had already been argued, and the petitioner had already been sentenced in federal court on a weapons charge arising out of the same incident. Counsel was unable to get the State to offer the petitioner a plea bargain because "they had revoked offers upon his arguing the motion to suppress and were not going to make another offer." Counsel stated that he had concerns about the petitioner's mental status. However, the federal presentence report indicated that a May 2000 evaluation of the petitioner revealed that he had "at least a low average to average reasoning abilities," appeared to function in the normal intellectual range, and did not have "any mental disease, or defect which would hinder his ability to understand the nature and consequences of the proceedings against him, or to assist properly in his defense." Counsel determined that the results of the evaluation would not have affected the petitioner's competency to stand trial, support an insanity defense, or negate elements of the offense, but could be helpful as a mitigating factor at sentencing.

Third trial counsel testified that the possible defense theories were that someone else had stolen the truck, the victim did not sustain serious bodily injury, and the petitioner never "asported"

with the money bag. The petitioner also told counsel that he had been tricked into committing the crime, but he never gave counsel the name of the person who tricked him or otherwise help locate that person. However, the petitioner's statement contained his admission of guilt and the assertion that other people were involved. Counsel also tried to suggest, during his cross-examination of the victim, that the victim himself was involved. Counsel recalled that the petitioner elected not to testify at trial.

Third trial counsel testified that he ordered a state mental evaluation of the petitioner between trial and sentencing in an effort to find some mitigation for sentencing. Counsel offered the new evaluation into evidence at the sentencing hearing without calling the doctor as a witness.

Counsel testified that the petitioner did not inform him that one of the jurors bore a personal animus toward him until after the trial, otherwise counsel would have struck that juror. Members of the petitioner's family also informed counsel after trial but before the motion for new trial that the juror had informed them that the jury had come to a compromise on the verdict. In response to that allegation, counsel asked to have the hearing on the motion for new trial reset so he could investigate. Counsel recalled that he talked to the juror on the telephone, and "it didn't pan out as something that we could put forward at the motion for new trial." Therefore, counsel informed the court that he could not in good faith pursue the issue of the quotient verdict. He recalled that the State also informed the court that it "had interviewed a couple of jurors and that they denied any arrangement of that sort."

On cross-examination, third trial counsel testified that some investigation had already been done when he took over the case, and he had six months in which to prepare before trial. Counsel had a discussion with the previous attorney, including a discussion regarding the petitioner's defenses. Counsel recalled that the evidence against the petitioner consisted of his statement to police, a surveillance videotape of the encounter, eyewitness testimony, his identification from a photographic array, and his apprehension at the scene. Counsel said that he questioned the petitioner's mental status when he saw the petitioner wearing store-bought eyeglasses that still had an adhesive label on the lenses. However, he clarified that it did not cause him to question the petitioner's competency or sanity.

Third trial counsel acknowledged that he only requested funding for the expert services of one psychologist and that was during the sentencing proceedings. The psychologist reached the conclusion that the petitioner was in the very low range of intelligence. Asked if he should have pursued the petitioner's mental health issue at trial, counsel said:

[T]hinking about it now, there's a way to get it admitted, you know, I suppose you may have a relevancy heard if it really provides a defense it would be relevant, because they don't sentence, they just decide the facts of the crime. I think conceivably that there could be something there that would -- you'd either get to the point where he's so impaired that he doesn't really know what would stop this. He

4

wouldn't know that you're not suppose[d] to hop in a truck and drive it off, if it's somebody else's, assuming that's what happened.

That's a pretty hard standard to sell, in my mind.

Counsel stated that he did not have the psychologist testify at the sentencing hearing even though he could have. He elaborated that he "had a lot of difficulty dealing with the psychologist" and getting the report from her.

With regard to allegations regarding impropriety within the jury, third trial counsel testified that he personally spoke with the juror, and he acknowledged that his statements at the motion for new trial indicated that he had subpoenaed the juror twice but the sheriff's office had either never attempted or obtained service on the juror. Counsel acknowledged that he did not make any other efforts to get in contact with the juror. Counsel said that he did not think he spoke to other jurors regarding the allegation of a quotient verdict but that the prosecutor "went on the record and said that he, or someone in his office[,] had inquired with a couple of jurors about that issue."

In support of a motion to subpoena the jury panel from the petitioner's trial, Loretta Starks, a "[f]riend girl" of the petitioner's for approximately twenty years, testified that she was present throughout the petitioner's trial. She recalled that the jury returned with a verdict in less than ten or fifteen minutes. Afterward, she and a friend waited outside for the juror, whom they had known for many years, to inquire why it took such a short time to return with a verdict. According to Starks, the juror told her:

> [W]hen we got back we didn't read no laws or nothing. He said the bailiff came in and said if you all don't want to be here all day, you all just go ahead and take a vote and when you all take the vote, you all will be out of here. And I was like, you all didn't read anything or nothing? And he was like, uh uh, he said, three of us pleaded guilty and -- I mean three of us pleaded not guilty and the rest of the jury pleaded guilty and we -- they made the verdict and we came out.

Starks said that they stood there for another ten minutes, and the juror said, "[T]hey just gave him a bum deal" and left. Starks stated that she had since tried unsuccessfully to locate the juror.

On examination by the court, Starks testified that she called the petitioner's attorney in response to the juror's statement, and the attorney told her, "[W]e just got a bum deal, so the only thing you all can do is probably just re-appeal it." She acknowledged that the attorney investigated the claim but said he was not "really giving his total commitment to it[.]"

Deputy Alfredo Henry with the Shelby County Sheriff's Department testified that he worked as a court room deputy and had no recollection of the petitioner's trial.

5

Following the conclusion of the multi-part evidentiary hearing, the post-conviction court entered a lengthy order denying the petitioner relief.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

6

# I.  Quotient Verdict

The petitioner argues that third trial counsel was ineffective for failing to investigate and challenge the jury's verdict as having been a quotient verdict and the product of outside influences. The State responds that the petitioner has waived the issue or, in the alternative, that the petitioner did not meet his burden of proving that counsel was ineffective in this regard.

In its findings, the court noted that this allegation was not contained in the petitioner's original or amended petitions but was instead only an oral allegation.  The court did not clearly allow the oral amendment of the petitioner's petition to include this allegation, but the court rendered findings on the issue.  However, after its specific findings, the court stated that a petitioner cannot raise additional claims or allegations that were not contained in his or her petition or amended petition.

The petitioner asserts that the issue regarding third trial counsel's ineffectiveness in handling the issue of juror misconduct is properly before this court because the issue was first brought up by the State during its direct examination of counsel, the State objected on grounds that the issue had been previously determined at the motion for new trial hearing and not as being outside the petition, he asked that he be allowed to orally amend his petition, the issue was thoroughly discussed at the hearing, and the court actually ruled on the issue.  Even though the post-conviction court did not explicitly allow the petitioner to orally amend his petition, in light of the above and Tennessee Supreme Court Rule 28, § 8(D)(5), which provides "[i]f evidence is objected to on the basis that it concerns issues not raised in the petition or answer, the court may allow amendments and shall do so freely when the presentation of the merits of the cause will otherwise be subserved," we will address the claim.

At the motion for new trial hearing, third trial counsel informed the court that one of the jurors had contacted the petitioner's family after trial and counsel "believe[d]" he had spoken to him briefly.  Counsel said that the juror told him "that when the jurors retired to deliberate that they decided that they were going to make it by majority vote, and assuming once the majority was found, the rest of the jurors would fall in line."  Counsel stated that he subpoenaed the juror, but the juror was not present at the hearing.  The court continued the hearing to allow time for investigation into the matter.

Although lengthy, in order to properly address this issue, it is important to detail the portions of the court record in question.  During the continued motion for new trial hearing, the following exchange occurred:

> [Third Trial Counsel]:  As to the issue we're going to waive for purposes of a new trial, and consequently for appeal, I had received some communication that [the juror] knew [the petitioner] and also that the jury verdict was not unanimous.  We subpoenaed [the juror] twice, and the sheriff's office never – either never attempted or never got service of [the juror].  Rather than have that happen again, I decided to

look into it a little more. I politely called some jurors, and I believe [the prosecutor] can summarize his investigation as well, and the issue simply didn't pan out. I spoke to [another juror], who was on the jury. She said that wasn't how it happened in the jury box at all, and I just don't feel that I can go forward on that question, and we would waive that question for a new trial.

. . . .

[Prosecutor]: I spoke to the foreperson who, likewise, didn't support that claim. My only concern, at this point, absent the statement from counsel is what we have on the record is counsel saying that he talked to that person, and he insisted that it was a quotient verdict. I don't know if he's talked to that juror again, but what I don't want to happen is, eight years now [sic], a post conviction, the public defender's office pick it up and allege ineffective assistance of counsel for failing to call this person here. . . .

The Court: Right, I understand your concern. My assumption was, and tell me if this is a fair characterization of your position; that after having spoken to this juror who allegedly made this statement regarding a quotient verdict, and evaluating the circumstances of his statement, and the circumstances surrounding how this information came to you, and then having spoken to other jurors who contradicted all of those statements and circumstances, it's your position, as an officer of the court, that you cannot, in good faith and in clean conscience, go forward with that assertion. Is that a fair statement?

[Third Trial Counsel]: That's absolutely correct.

. . . .

And I'll stand behind that decision. I think even if we had called [the juror], and he testified to that effect, which I have my doubts, there are other jurors who would have contradicted that.

As such, third trial counsel waived the quotient verdict issue, and now the petitioner argues that counsel rendered deficient performance for not adequately investigating the issue. He asserts that counsel should have done more than "politely call[] some jurors," should have sought to subpoena all of the jurors to the motion for new trial hearing, and should have vigorously pursued filing a motion asking the trial court to subpoena all of the jurors. He also argues that the post-conviction court's failure to subpoena the jury panel for the post-conviction hearing deprived him of the opportunity to establish that he was prejudiced by counsel's "deficient" performance.

As to these claims, the post-conviction court found:

Contrary to his assertion, his attorney did investigate the matter to some extent prior to the hearing on the motion for new trial and found no evidence to go forward with the issue. Petitioner has offered no evidence of any jury impropriety in the post-conviction proceedings. Absent a presentation of such evidence in the post-conviction court, the Petitioner cannot establish prejudice in his trial attorney's investigation of the matter. The Petitioner did present hearsay testimony [which was not admitted for the truth of the matter asserted] in the form of testimony from an old long-time girlfriend in an effort to require this court to subpoena into court all of the jurors in Petitioner's trial to make a "fishing expedition" into this matter. This court has grave concerns in dragging into court jurors long after a trial for the purpose of attempting to impeach a jury verdict. The Court finds that Petitioner[']s claims that there was some impropriety with the jury and its verdict are simply not credible. In the post-conviction court, Petitioner only offers the testimony of an old girlfriend, but not testimony from [the juror] or any other juror. Petitioner has failed to carry his burden of proof on this issue and failed to show sufficient reasons to justify any further inquiry on this issue.

We agree that the petitioner has failed to show that third trial counsel rendered deficient performance or that such deficient performance caused him prejudice. The transcript of the second motion for new trial hearing reflects that counsel determined the quotient verdict allegation to be unsubstantiated based on his and the prosecutor's discussions with some of the other jurors. Moreover, he at least twice attempted to subpoena the juror to the motion for new trial hearing to no avail. At the post-conviction hearing, the only proof the petitioner offered in support of his claim was the convoluted testimony of his long-time girlfriend relaying what the juror supposedly told her. Furthermore, the record shows that the court individually polled each juror regarding the verdict, and no discord is noted in the record.

In support of his allegation regarding the post-conviction court's failure to subpoena the jury panel to the evidentiary hearing , the petitioner relies on State v. Robert Emmet Dunlap, Jr., No. 02C01-9801-CC-00009, 1998 WL 641338, at *3 (Tenn. Crim. App. Sept. 21, 1998), in which a panel of this court held that the trial court must investigate the alleged wrongdoing when it is brought to the court's attention that extrinsic influence or information "may have been brought to bear upon the jury." However, the panel noted that the trial court has broad discretion in pursuing this inquiry and that "[p]otentially suspicious circumstances do not justify such an inquiry. Something more than unverified conjecture must be shown." Id.

We conclude that the post-conviction court did not abuse its discretion in declining to subpoena the jury panel for the evidentiary hearing because, as noted by the court, the petitioner "failed to show sufficient reasons to justify any further inquiry on this issue." At the final evidentiary hearing, post-conviction counsel stated that he had a list of the names of those on the jury panel but had not located their addresses. It should be noted that the evidentiary hearing was conducted in four parts over a five-month period. Asked about his efforts to find the juror, post-conviction counsel said that he had tried unsuccessfully to locate him through friends of the

petitioner or the juror and that apparently the juror had not been seen in two or three years. The post-conviction court concluded that the claim regarding jury impropriety lacked credibility and was only supported by the hearsay testimony of the petitioner's long-time girlfriend. The petitioner's claim is no more than "unverified conjecture." The juror neither voiced a complaint when polled by the trial court nor responded to the petitioner's attempts to subpoena him into court at the motion for new trial hearing. Moreover, counsel and the prosecutor's investigations during the motion for new trial pendency indicated that there was no good-faith basis to go forward on this claim. The post-conviction court acted within its discretion in determining that the extreme action of subpoenaing all the jurors into court to testify was not justified under the facts and circumstances of this case.

## II. Mental Health Issue

The petitioner lastly argues that third trial counsel was ineffective for failing to adequately investigate a mental health defense for trial. He asserts that counsel should have had him evaluated by an independent psychologist prior to trial to determine whether he could have relied on a diminished capacity argument.

With regard to this issue, the post-conviction court noted:

The record shows that defense counsel was aware of a mental evaluation conducted in federal court prior to trial which did not raise the possibility of a mental defense, that he obtained a state mental evaluation prior to sentencing, and that the same was presented to the trial judge at sentencing. Further, in the post-conviction court, Petitioner has not presented any evidence that a mental defense was available, failed to produce any witnesses to support such a defense, failed to show that trial counsel could have located such witnesses, and failed to show that any such witnesses would have offered favorable testimony.

As to third trial counsel's performance, the record shows that counsel had the benefit of an evaluation contained in the petitioner's federal presentence report which noted:

65. In 1984, the [petitioner] was evaluated by the Memphis City Schools Mental Health Center to determine his eligibility for Special Education Services. The evaluation determined that the [petitioner] had a developmental reading disorder and that he was functioning within the low average range of intelligence.

66. In May 2000, the [petitioner] was evaluated at the Mental Health Evaluation Unit of the United States Medical Center for Federal Prisoners, Springfield, Missouri. The results are as follows:

**Psychological Testing**: The [petitioner] has at least low-average to average reasoning abilities.

**Clinical Testing**: The [petitioner] has difficulties in reading, but he appears to be functioning in the normal intellectual range.

**Prognosis**: The [petitioner] does not have any mental disease or defect which would hinder his ability to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

In addition, the petitioner acknowledges the existence of a letter from Dr. Lynne D. Zager to the trial court contained in the trial jacket that stated, based on her evaluation, it was her opinion that the petitioner was able to appreciate the nature and wrongfulness of his behavior. While this letter is not in the record before us, if it exists, it is presumable that counsel would have also been aware of its contents. Although counsel questioned the petitioner's mental acumen, he determined that the results of the federal evaluation would not have affected the petitioner's competency to stand trial, support an insanity defense, or negate elements of the offense, but could be helpful as a mitigating factor at sentencing. For this reason, counsel obtained an independent evaluation for sentencing; however, the court found the petitioner's mental health to mitigate only "to a limited extent." The petitioner failed to establish, by clear and convincing evidence, that counsel's performance fell below an objective standard of reasonableness.

Furthermore, as to prejudice, the petitioner acknowledges that he did not offer any proof at the evidentiary hearing regarding his ability to sustain a diminished capacity argument. Instead, he relies solely on statements made at the sentencing hearing that indicate the psychologist who evaluated him for sentencing determined that he had an IQ of 54 and was mildly mentally retarded. To satisfy the prejudice requirement of Strickland when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). We will not speculate as to what these unknown witnesses would have testified. Therefore, the petitioner has failed to prove a reasonable probability that the results of the proceeding would have been different had counsel conducted additional investigation into his mental health for trial.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the denial of the petitioner's petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

11